**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Judith Klosek,                                     Civil No. 08-426 (JNE/JJG)
Linda Davenport,

      Plaintiffs,

                                      **REPORT**
v.                                                 **AND**
                                      **RECOMMENDATION**

The American Express Company,
Ameriprise Financial, Inc.,
Ameriprise Financial Services, Inc., f/k/a
American Express Financial Advisors, Inc.,

      Defendants.

---

JEANNE J. GRAHAM, United States Magistrate Judge

      This matter came before the undersigned on May 6, 2008 on the defendants' motions to dismiss (Doc. Nos. 11, 13, 20, 21). Timothy J. Becker, Esq.; Carolyn G. Anderson, Esq.; Gregg M. Fishbein, Esq.; and Kirsten D. Hedberg, Esq., appeared for the plaintiffs. David W. Moon, Esq., and David A. Applebaum, Esq., appeared for defendant American Express. Edward B. Magarian, Esq., and I. Jenny Winkler, Esq., appeared for defendants Ameriprise Financial and Ameriprise Financial Services. These motions are referred for a report and recommendation in accordance with 28 U.S.C. § 636 and Local Rule 72.1(b).

I.     **BACKGROUND**

      In this matter, plaintiffs Judith Klosek and Linda Davenport are respectively former and current franchisees for defendant Ameriprise Financial Services. Briefly put, the plaintiffs work as financial advisors, offering products and services from Ameriprise Financial Services to their clients.

The underlying dispute arises out of the spin-off of Ameriprise Financial Advisors, which was previously named American Express Financial Advisors, from its former corporate parent, defendant American Express.  The plaintiffs entered their franchise agreements with Ameriprise Financial Advisors in 1999 and 2002.  The spin-off transaction was announced in February 2005 and the new name was announced in May 2005.  The transaction was completed, and Ameriprise Financial Advisors started operations under its current name, in August 2005.

The plaintiffs bring this putative class action against Ameriprise Financial Advisors; its current parent, defendant Ameriprise Financial; and its former parent, American Express.  They chiefly allege that, under the terms of the franchise agreements, Ameriprise promised to provide a well-established brand.  When Ameriprise stopped using the American Express marks after the spin-off, the plaintiffs contend, they were denied a well-established brand.

From these allegations, the plaintiffs bring claims against Ameriprise Financial Advisors for breach of contract, breach of the covenant of good faith and fair dealing, and violations of the Minnesota Franchise Act, among other relief.  They also bring a claim against American Express for tortious interference with contract.  The defendants now move to dismiss for failure to state a claim.

## II.   DISCUSSION

The defendants bring their motions to dismiss under Rule 12(b)(6).  Under this rule, a defendant may seek dismissal where the allegations in the complaint are so deficient that they provide no cause for relief.  *Quinn v. Ocwen Federal Bank FSB*, 470 F.3d 1240, 1244 (8th Cir. 2006).  When considering this question, a court is ordinarily limited to the complaint, with all reasonable inferences taken for the plaintiff.  *Potthoff v. Morin*, 245 F.3d 710, 715 (8th Cir. 2001); *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

Under this standard of review, a court may also examine documents that are "necessarily embraced by the complaint," *Enervations, Inc. v. Minnesota Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004), and whose authenticity is not questioned, *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 31 (8th Cir. 2003) (quotation omitted). Because both sides frequently cite the applicable franchise agreements, as well as the Uniform Franchise Offering Circulars (UFOCs) that accompany those agreements, this Court holds that these documents are appropriately part of the record here.[1]

## A.    Obligation to Provide a Well-Established Brand

In the first of the seven counts in their amended complaint,[2] the plaintiffs assert a claim against Ameriprise Financial Services (Ameriprise)[3] for breach of contract, based on its alleged failure to provide a well-established brand. Resolution of this claim, however, influences many of the remaining counts.

---

[1]     For unknown reasons, the plaintiffs did not attach the applicable franchise agreements to their amended complaint, and they instead attach a draft franchise agreement from 2005. But the defendants include, with their motion papers, actual copies of the franchise agreements that the plaintiffs executed in 1999 and 2002. The parties have not contested that these agreements are controlling here.

[2]     In passing, Ameriprise suggests there may be a question whether the plaintiffs' original complaint or amended complaint is operative. The plaintiffs correctly observe that, because the defendants had not filed answers, there was no responsive pleading that prevented the plaintiffs from filing an amended complaint. *See, e.g., Williams v. Bd. Of Regents of Univ. Sys.*, 477 F.3d 1282, 1291 (11th Cir. 2007); *Minnesota by Humphrey v. Standard Oil Co.*, 568 F.Supp. 556, 559 (D.Minn. 1983).

[3]     The primary defendant in this litigation is Ameriprise Financial Services, Inc., the successor of American Express Financial Services, Inc. For brevity, Ameriprise Financial Services, Inc. will be referred to as Ameriprise. Another defendant, Ameriprise Financial, Inc., is the current parent of Ameriprise Financial Services, Inc. and it has a comparatively small role in this litigation. As the same counsel represents both the parent and its subsidiary, references to Ameriprise in the singular may sometimes include both defendants.

1.      **Plain Language Analysis**

As a fundamental rule, the meaning of a contract must be determined in accordance with the intent of the parties, as that intent is reflected by the language in the contract.[4]   *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003).   Regarding the parties' interests in the brand, the best place to begin is in section 8 of the franchise agreements, which is titled "Proprietary Marks."   This section states in relevant part,

> With respect to Independent Advisor's use of the Proprietary Marks:
>
> . . . .   If [American Express Financial Advisors] is no longer authorized to use the Proprietary Marks, Independent Advisor will not be able to continue to use the Proprietary Marks[.]
>
> * * *
>
> Independent Advisor expressly understands and acknowledges that:
>
> . . . .
>
> Independent Advisor's use of the Proprietary Marks does not give Independent Advisor any ownership interest or other interest in or to the Proprietary Marks;
>
> . . . .
>
> AEFA reserves the right to substitute different proprietary marks for use in identifying the System and the businesses operating thereunder at AEFA's sole discretion.

Ameriprise contends that, because these provisions unambiguously grant it discretion to substitute different marks, it has no obligation to provide a well-established brand.   The plaintiffs

---

[4]      The parties present their arguments under Minnesota law.   Consistent with the choice-of-law clause in the franchise agreements, the parties do not contest that Minnesota law is applicable here.

respond that these provisions are ambiguous, and under other parts of the franchise agreements, Ameriprise has an obligation to provide a well-established brand.

When interpreting contractual terms, a court should not view those terms in isolation, but instead must decide their meaning in the context of the contract as a whole. *Republic Nat'l Life Ins. Co. v. Lorraine Realty Corp.*, 279 N.W.2d 349, 354 (Minn. 1979) (quotation omitted). If the meaning of the terms is plain, those terms shall be enforced consistent with their plain meaning. *Minneapolis Public Housing Authority v. Lor*, 591 N.W.2d 700, 704 (Minn. 1999). Further analysis is unneeded unless the terms are ambiguous, meaning the terms are susceptible to more than one reasonable interpretation. *Illinois Farmers Ins. Co. v. Glass Serv. Co.*, 683 N.W.2d 792, 799 (Minn. 2004).

The franchise agreements expressly reserve Ameriprise's right to substitute new marks at its discretion. Consistent with this reservation, the agreements recognize that the plaintiffs have no rights to the marks, and that there may be circumstances where Ameriprise may not be able to use the American Express marks. This language unambiguously indicates that Ameriprise has no obligation to supply a well-established mark to the plaintiffs. As a result, the plaintiffs cannot bring a claim for breach of contract on this basis.[5]

---

[5]     Arguing against this outcome, the plaintiffs cite *American Express Financial Advisors, Inc. v. Hazlewood*, an unpublished decision from the Eastern District of Arkansas. No. 05-936, 2005 WL 4655136 (E.D.Ark. 2005). At the time, Ameriprise and one of its former franchisees were in arbitration regarding a dispute under their franchise agreement. Ameriprise alleged that the franchisee had violated a covenant not to compete and, to preserve the status quo during the arbitration proceedings, it sought for an injunction to enforce the noncompete. *Id.* at *1.
    Like the current litigation, the arbitration in *Hazlewood* was evidently precipitated by the name change from American Express to Ameriprise. The plaintiffs contend, and this Court has no reason to doubt, that the franchise agreement at issue in *Hazlewood* is substantially similar to those at issue here.
    In the *Hazlewood* decision, the court considered a motion for a preliminary injunction. Under the applicable standard of review, one issue was whether Ameriprise was likely to prevail on the merits. The franchisee argued in part that the noncompete was unenforceable because of

As noted earlier, this outcome affects the viability of many other claims in the plaintiffs' amended complaint. Before reaching those matters, however, it is necessary to address the numerous arguments that the plaintiffs raise against this outcome.

### 2. Meaning of "the System"; Recitals

#### a. Background

The franchise agreements say that Ameriprise "reserves the right to substitute different proprietary marks for use in identifying the System and the businesses operating thereunder[.]" The plaintiffs argue that, because the term "the System" is ambiguous, it is necessary to look to other terms of the contract and to extrinsic evidence.

As the plaintiffs correctly observe, the franchise agreements do not explicitly define what the System is, but the recitals in the franchise agreements *describe* the System this way:

> AEFA has developed a distinctive system that offers, through financial advisors, a variety of financial services to individuals and/or business owners (the "System"). . . .
>
> The distinguishing characteristics of the System include a well recognized brand; distinctive products & services; high level of securities and regulatory compliance; the highest standards of customer service and quality advice, including financial planning; administrative procedures providing superior customer service, including consolidated statements; orientation programs; advertising and promotional programs; and direct marketing services, telemarketing and on-line services directed to clients; all

---

an anticipatory breach, which occurred when Ameriprise failed to provide a well-established brand. The court did not expressly rule on whether Ameriprise had an obligation to provide a well-established brand; it chiefly determined that "serious" issues were raised about this issue. *Id.* at *5, *6. Considering anticipatory breach *and* other unrelated arguments, the court ultimately determined that Ameriprise was not likely to prevail on the merits. *Id.* at *8.

Under the standard of review in *Hazlewood*, the question before the court was whether Ameriprise was likely to prevail in its efforts to enforce the noncompete. To the extent the court discussed Ameriprise's obligation to provide a well-established brand, the discussion was but a collateral part of the entire analysis. The court did not expressly rule on whether Ameriprise had an obligation to provide a well-established brand, nor did it interpret relevant provisions in the franchise agreement. For these reasons, *Hazlewood* does not aid the plaintiffs' arguments here.

of which may be changed, improved, and further developed by
AEFA from time to time.

The System is identified by trade names . . . including, the mark
"American Express," (the "Proprietary Marks")[.]

Independent Advisor desires to contract with AEFA to operate a
business offering Products & Services under the System and using
the Proprietary Marks . . . .

(Emphasis omitted).  Because this Court previously ruled that the operative provisions of the

franchise agreements are unambiguous, it is not necessary to decide precisely what "the System"

means.  Reading the operative provisions of the agreements as a whole, moreover, it is plain that

the System simply refers to the franchise itself.  With these caveats, however, this Court will

address the term and the significance of the recitals where the term appears.

The plaintiffs contend that, because the first named characteristic of the System is a well-

recognized brand, the franchise agreement promises this feature.  Ameriprise responds that, to

the extent the recitals mention a well-recognized brand, they cannot override the plain language

in the operative provisions of the contract.  To support their respective positions, the parties hotly

dispute the effect of nearly every Minnesota case on recitals.

### b.      Case Law

This discussion is best opened with the decision of the Minnesota Supreme Court in *Horn*

*v. City of Minneapolis*.  234 N.W. 289 (1930).  In that case, the court examined a deed in which a

recital exempted taxes on certain land "for parkway purposes."  The operative provisions were

more specific, referring to tax exemptions for "parkways" and "park improvements."  *Id.* at 290-

91.  It ruled,

If the recitals are clear . . . and the operative part . . . is ambiguous,
then the recitals govern.  Vice versa the operative part prevails.  If
both the recitals and the operative part are clear, but are
inconsistent with each other, the operative part is to be preferred.

*Id.* at 291 (quotation omitted).  The court held that a narrow interpretation of the deed, based on the recital alone, was inappropriate.  Implying that the operative provisions were unambiguous, the court enforced those provisions instead.  *See id.*

That court further examined recitals in *Berg v. Berg*.  275 N.W. 836 (1937).  This case involved an antenupital agreement that set out the property rights of the surviving spouse.  Even though operative provisions were silent about the rights of the deceased spouse's heirs, a recital said the purpose of the agreement was to "fix[ ] the property rights of the heirs and children by the former marriages of both parties[.]"  When one spouse died, the heirs sought to rescind the agreement.  They argued, in part, that the recital reflected the true intention of the parties, and so the agreement was unenforceable because the operative terms did not discuss the property rights of the heirs.  *Id.* at 838, 841.

The *Berg* court initially observed, "The recital is no part of the contractual obligations assumed by the terms thereof."[6]  *Id.* at 841.  It then added,

> [P]aragraphs in a contract containing recitals of the purposes and intentions of the parties thereto are not strictly speaking parts of the contract, unless adopted as such by reference thereto.  The obligation of the parties to each other are not fixed by the terms of these recitals, and the only purpose thereof is to define or limit the obligations which the parties have taken upon themselves where the extent thereof is uncertain, or to aid in interpreting any ambiguous language used in expressing such obligation. . . .  [A recital] will be looked to in construing the contract, and to supply omissions therefrom which are capable of being supplied by reference to such recitals, but in no sense will it be the basis of a legal and binding obligation of the parties.

---

[6] This proposition was later cited favorably, in dictum by the Eighth Circuit, in *Pieper, Inc. v. Land O'Lakes Farmland Feed, LLC*.  390 F.3d 1062 (8th Cir. 2004).  That decision did not otherwise consider the effect of recitals, except to say recitals may be used as extrinsic evidence to show frustration of purpose.  *Id.* at 1065-66.  Because the *Pieper* court was not examining any questions of contractual interpretation, its ruling does not meaningfully advance the discussion here.

*Id.* at 842 (quoting *Martin v. Rothwell*, 95 S.E. 189, 190 (W.Va. 1918)).  As in *Horn*, the court implicitly signaled that the operative provisions were not ambiguous, and so it was not necessary to look to the recitals.  *See id.* at 841.  The court, nevertheless, rejected the heirs' interpretation of the recitals and determined that the recitals were consistent with the operative terms.  *Id.*

The plaintiffs substantially rely on an ensuing case from the Minnesota Supreme Court, *Downing v. Independent School District No. 9.*  291 N.W. 613 (1940).  This case did not involve the interpretation of recitals in a contract, but instead recitals in a school board resolution.  The resolution terminated all teachers from employment, and a recital to the resolution noted that such termination was in anticipation of a tenure law that had yet to be passed by the Minnesota Legislature.  A teacher raised a claim for declaratory judgment, arguing that the termination was without cause and ineffective.  *Id.* at 614-15.

The issue was whether the recitals could supply cause for termination, and thus make the termination effective.  At the outset, the court observed that common principles control recitals in contracts and those in the resolution.  It then said,

> In construing written agreements the actual undertaking of the parties is to be deduced from the entire instrument, taking into consideration, reconciling, and giving meaning to all its parts so far as possible, including recitals as well as operative clauses, and, when so considered, language which has a distinct meaning standing alone may, in the connection used, become doubtful or its meaning modified by particular parts of the agreement, including recitals.

*Id.* at 616 (quoting *Thomson Elec. Welding Co. v. Peerless Wire Fence Co.*, 157 N.W. 67, 70 (Mich. 1916)).  The court added, "[G]eneral and unlimited terms are restrained and limited by particular recitals, when used in connection with them."  *Id.* at 616-17 (quotation omitted).

The court noted some ambiguities regarding the legal effect of termination, based on the fact that the authority of the school board might be constrained by pending legislation.  It then reasoned that, because the main text of the resolution did not explain how termination would be effected, it was appropriate to examine the recitals.  *Id.* at 617-18.  But three justices dissented from this result.  They determined that the operative terms of the resolution were unambiguous, and citing *Berg*, thought it inappropriate for recitals to be used to modify those terms.  *Id.* at 619.

The next apposite case is one from this District, *Coca-Cola Bottling Co. of Minnesota, Inc. v. Coca-Cola Co.*  164 F.Supp. 293 (D.Minn. 1957).  The dispute was whether a franchise agreement limited the franchisee, a bottler, to packaging soft drinks in bottles or whether it could also prepare tanks of the drink for vending machines.  The operative terms generally referred to bottles alone, but the franchisee cited a recital that mentioned bottles "and other receptacles."  *Id.* at 300-01.

Citing *Horn*, the court stated, "It is well established that the recitals do not govern the operative provisions of a contract unless the operative provisions are ambiguous."  *Id.* at 301-02.  The court ruled that the operative provisions were unambiguous, and for this and other reasons, it held that the recital was immaterial.  *Id.*

The Minnesota Court of Appeals reached this topic in *State by Crow Wing Environment Protection Association, Inc. v. City of Breezy Point*.  394 N.W.2d 592 (Minn. App. 1986).  This case involved a settlement agreement, which granted one party the right to develop campsites on certain property.  The operative terms only mentioned campsites, but the recitals described the development as "condominium campsites, homesites and related facilities."  Based on a prior appeal, the court observed that the term "campsites" was ambiguous.  Citing *Berg*, the court held

recitals "are not the basis of a binding agreement," but they may be used to interpret ambiguous terms. It ultimately relied on the recital to interpret the term "campsites." *Id.* at 596.

**c.   Analysis**

The preceding review helps illustrate the controlling principles in this area. *Berg* and its progeny generally state that recitals cannot supply contractual obligations. *Coca-Cola Bottling Co. of Minnesota, Inc.*, 164 F.Supp. at 301-02; *Berg*, 275 N.W. at 841-42. In dictum, *Berg* also suggests an exception to this rule: where recitals are incorporated into the operative terms by reference, they become operative terms. *Berg*, 275 N.W. at 842.

Where recitals are not operative terms of a contract, then under the general rule, they may be used to resolve ambiguities in the operative terms. *Berg*, 275 N.W. at 842; *Horn*, 234 N.W. at 291; *Crow Wing Environment Protection Ass'n*, 394 N.W.2d at 596. Conversely, recitals cannot be used to contradict unambiguous operative terms. So where unambiguous operative terms are contradicted by the recitals, the operative terms govern. *Coca-Cola Bottling Co. of Minnesota, Inc.*, 164 F.Supp. at 301-02; *Berg*, 275 N.W. at 842; *Horn*, 234 N.W. at 291.

*Downing* does not easily fit into this framework. The case appears to suggest that, even if the operative terms are unambiguous, the recitals may be used to *create* ambiguity. 291 N.W. at 616 (quoting *Thomson Elec. Welding Co.*, 157 N.W. at 70). Assuming for the sake of argument that *Downing* sets out such a rule, however, that rule is not applied to the facts of the case.

The inquiry was whether the board's resolution resulted in termination of the teachers' employment, and the operative terms did not describe the cause or effect of termination. So in effect, "termination" was ambiguous, and consistent with how recitals are applied elsewhere, the *Downing* court employed recitals to resolve that ambiguity. *See id.* at 616-17; *cf. Crow Wing*

11

*Environment Protection Ass'n, Inc.*, 394 N.W.2d at 596 (using recitals to resolve ambiguous meaning of "campsites").

As the *Downing* court stressed, ambiguity was caused by other inconsistencies in the law. Although the dissent complains that the court was using the recitals to create an ambiguity, the majority was focused on the fact that the authority of the school board was uncertain, due to pending legislation.  *See* 291 N.W. at 618, 619.  Such circumstances also suggest a reason to distinguish *Downing*:  as the case involves a resolution—and *not* a contract—the analysis was shaped by larger questions about the legislative authority of the school board.

### d.    Outcome

Having reviewed the applicable law, the analysis turns to the current litigation.  As many cases have emphasized, recitals cannot supply contractual obligations by themselves.  So to the extent that the recitals in the franchise agreements refer to a well-established brand, they cannot obligate Ameriprise to provide a well-established brand.

The plaintiffs thus argue, pursuant to the dictum in *Berg*, that the recitals are incorporated into the operative terms by reference and are thus part of the operative terms.  Assuming that this rule applies, the agreements lack language that expressly incorporates the recitals by reference.

Anticipating this result, the plaintiffs further suggest that incorporation by reference may be *implied*, based on the fact the operative terms refer to "the System."  But the plaintiffs have not cited authorities that meaningfully support this position, and this Court is not persuaded that incorporation by reference can be implied.  Such a rule has the potential to create a backdoor for incorporating all sorts of extrinsic documents into the operative terms of a contract.  This result arguably undermines the principle that contractual interpretation, first and foremost, focuses on

the language in the contract itself.  *See Travertine Corp. v. Lexington-Silverwood*, 683 N.W.2d 267, 271 (Minn. 2004).

Because the recitals cannot be given effect as operative terms, the question then becomes whether they are needed to resolve an ambiguity in the operative terms.  As this Court previously decided that the agreement is unambiguous, it is not necessary to reach this question.

Consistent with the prior discussion of *Downing*, the plaintiffs may suggest that where a recital contradicts an otherwise plain operative term, the operative term becomes ambiguous.  As this Court previously determined, it is doubtful that *Downing* stands for this proposition.  To the contrary, other case law stresses that a recital cannot overcome an unambiguous operative term.  The plaintiffs also argue, however, that the operative terms are ambiguous because they refer to the System.

Assuming "the System" is ambiguous, however, that scenario does not alter the outcome here.  The issue then becomes what the System is.  Where the recitals describe the System, they essentially describe features of the franchise.  And in the operative terms, the System is used as shorthand for the franchise as a whole.  If "the System" is interpreted this way, in the provision where Ameriprise reserves its right to substitute other marks, then that right is not affected.

Although the recitals suggest that a well-established brand is an important feature of the System, they also indicate a well-established brand is but one of many features that constitute the System.  Nevertheless, if the recitals impose an obligation to provide a well-established brand, this obligation is contradicted by the operative terms.  And in such circumstances, specific terms have precedence over more general ones.  *Medtronic, Inc. v. Convacare, Inc.*, 17 F.3d 252, 255 (8th Cir. 1994).  Thus the express reservation, in the section on proprietary marks, will otherwise override a general promise in the recitals.

### 3.        Exercise of Discretion

Focusing on other provisions in the franchise agreements, the plaintiffs separately assert that Amerirprise had a general obligation to exercise its discretion in a manner that improves the franchise. The plaintiffs argue that this general obligation encompasses an obligation to provide a well-established brand.

This argument is primarily founded on language that only appears in the 2002 franchise agreement executed by Klosek. Section 24 of that agreement states in relevant part,

> AEFA has the right to operate, develop and change the System in any manner that is not specifically precluded by this Agreement. Whenever AEFA has reserved in this Agreement a right to take or omit an action, except as otherwise expressly provided in this Agreement, AEFA may make its decision or exercise its rights on the basis of the information readily available to AEFA, and AEFA's judgment of what is in its best interests and/or in the best interests of the System, at the time AEFA's decision is made shall be deemed to be reasonable and enforceable, without regard to whether other reasonable or even arguably preferable decisions could have been made by AEFA and without regard to whether AEFA's decision or the action AEFA takes promotes AEFA's financial or other individual interest.

The plaintiffs read this language in conjunction with one of the previously quoted recitals, which states,

> The distinguishing characteristics of the System include a well recognized brand; distinctive products & services; [etc.] . . . all of which may be changed, improved, and further developed by AEFA from time to time.

The plaintiffs initially observe that section 24 provides Ameriprise discretion "except as otherwise expressly provided in this Agreement." They then suggest, pursuant to this exception, that the recital expressly limits Ameriprise's discretion over named elements of the System: As the recital provides that the System "may be changed, improved, *and* further developed," the

plaintiffs treat it as a unitary obligation, arguing that any changes to the System must also be improvements.  The plaintiffs thus claim, when Ameriprise stopped using the well-established American Express marks, that Ameriprise changed a critical feature of the System without due improvement.

Ameriprise counters that section 24 expressly reserves its right to exercise its discretion as granted by the franchise agreements.  It adds that, under the same section, its discretion must be deemed reasonable.  If the plaintiffs' claim is based on Ameriprise's misuse of its discretion, Ameriprise argues, then section 24 expressly counteracts such claims.

At the outset, it is enough to note that section 24 does not create contractual obligations by itself.  The section is an express reservation of rights, providing that Ameriprise may exercise its discretion as it sees fit.  The plaintiffs' position, moreover, hinges on the exception to this reservation.  So it is questionable whether the plaintiffs, by negative implication, can attribute an affirmative duty to Ameriprise.

With this caveat, the issue may be framed as follows.  If Ameriprise has a "right to take or omit an action"—with respect to branding or anything else—is an exception "otherwise expressly provided" elsewhere in the franchise agreements?  Put another way, the question is whether there is an express provision, elsewhere in the franchise agreement, which constrains Ameriprise's discretion.

The provision that the plaintiffs identify is one of the recitals.  The previous discussion of recitals, therefore, is also applicable here.  As this Court decided earlier, recitals cannot supply operative terms, except where the recitals are incorporated into the operative terms by reference.  And this Court further determined that, in the franchise agreements, the recitals have not been incorporated into the operative terms. *See infra* at 10, 12.

The recital, therefore, is not an express provision that limits the rights reserved under section 24.  And the plaintiffs do not identify any other provision in the franchise agreement that may create an exception to that section.  The plaintiffs, therefore, cannot establish a claim for breach of contract under this section.

There is also reason to doubt the way that the plaintiffs have interpreted the recital.  The plaintiffs contend that, because elements of the System "may be changed, improved, and further developed," all changes to the System must be improvements.  The System essentially includes every major feature of the franchise, so under the plaintiffs' view, Ameriprise would not be able to risk any changes to the franchise that might have negative effects.

These limits are impractical, if not impossible, in ordinary business operations.  And this interpretation also severely contradicts the discretion granted to Ameriprise under section 24, and elsewhere, in the franchise agreements.  Such an interpretation is not appropriate here.

### 4. Illusory Contract

The discussion now returns to section 8.  As this Court previously determined, under this section of the franchise agreements, Ameriprise expressly reserved its right to substitute different marks at its discretion.  The plaintiffs argue this provision is an illusory contract.  They contend that, because this provision gives Ameriprise unlimited discretion to change the marks, there is no real promise and the term is void for lack of consideration.  It then turns to other provisions in the franchise agreements, including the aforementioned recitals, to show that Ameriprise has an obligation to supply a well-established brand.[7]

---

[7]     Assuming that section 8 is void, the plaintiffs suggest a few other theories under which Ameriprise would have an obligation to supply a well-established brand.  One is that it could be implied, under the implied covenant of good faith and fair dealing; another was this obligation could be imposed by the court under its equitable power of reformation.  Because reformation is

For a contract to be illusory, and therefore without consideration, one party must have no obligations to perform whatsoever. *See Brozo v. Oracle Corp.*, 324 F.3d 661, 671 (8th Cir. 2003); *Grouse v. Group Health Plan, Inc.*, 306 N.W.2d 114, 116 (Minn. 1981). That rule does not apply here, because the franchise agreements impose obligations on both sides. What the plaintiffs propose, instead, is that the doctrine of illusory contract be used to void a single term.

There does not appear to be case law that supports this position. To the contrary, in cases where a term granted unlimited discretion to one party, the term is ordinarily valid and effective. *See City of Marshall v. Heartland Consumers Power Dist.*, 384 F.3d 517, 519 (8th Cir. 2004); *White Stone Partners, LP v. Piper Jaffray Cos.*, 978 F.Supp. 878, 882 (D.Minn. 1997); *see also Noreen v. Park Const. Co.*, 96 N.W.2d 33, 37-38 (Minn. 1959) (holding that a contract was supported by consideration though one term gave sole discretion to a nonparty). As the doctrine of illusory contract is not applied to individual terms, the plaintiffs' reliance on it is misplaced.[8]

---

not pleaded in the amended complaint, it does not require discussion here. The issues raised by the implied covenant are discussed in greater detail later.

[8]     In the context of their arguments on this topic, the parties cited a decision from the Fifth Circuit, *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*. 379 F.3d 159 (5th Cir. 2004). That case involved a contract for cellular telephone service. Under one term in this agreement, the service provider retained the right to change any of the terms in the agreement on written notice to the customer. Because the service provider had the unilateral right to alter any terms, some customers argued, it was not bound whatsoever and the agreement was illusory. *Id.* at 173.
          The *Iberia* court concluded that, under Louisiana law, the term was not illusory so long as the customer had an opportunity to review the new terms. If the customer had notice and continued to accept service, the court reasoned, then both parties remain bound under the new terms. *Id.* at 173-74.
          The contested term in *Iberia* granted one party power to change the terms of a customer service agreement. No similar power is granted to Ameriprise by the franchise agreements in the current litigation. The *Iberia* court considers a very different kind of contract under the law of another state. For these reasons, *Iberia* does not advance the analysis here.

5.        **Extrinsic Evidence**

Other than arguments founded in the language in the franchise agreements, the plaintiffs also cite extrinsic evidence to show Ameriprise's obligation to provide a well-established brand. This evidence consists of the Uniform Franchise Offering Circulars (UFOCs) that Ameriprise disclosed to the plaintiffs before the franchise agreements were executed.  The questions here are whether this evidence is appropriately considered, and if so, whether it shows an obligation to provide a well-established brand.

If language in a contract is unambiguous, then a court cannot look beyond the language in the contract itself.  A court only considers extrinsic evidence, therefore, where the terms in the contract are ambiguous.  *See Housing & Redevelopment Auth. v. Norman*, 696 N.W.2d 329, 337 (Minn. 2005).  This Court previously determined that the terms of the franchise agreements are unambiguous, and so there is no need to consider the UFOCs here.

At the motion hearing, the plaintiffs indicated that the UFOCs are properly considered under another provision in section 24 of the franchise agreements.  It states,

> This agreement, the attachments hereto, the Uniform Franchise Offering Circular and the documents referred to herein constitute the entire Agreement between AEFA and Independent Advisor concerning the subject matter hereof, and supersede all prior and contemporaneous agreements, negotiations and representations (written and oral), no other representations having induced Independent Advisor to execute this Agreement.

Based on this language, the plaintiffs contend the UFOCs are incorporated into the agreements themselves.

Minnesota law offers little guidance on this question.[9]   Perhaps the leading case is *In re Holtorf's Estate*, a decision from the Minnesota Supreme Court.  28 N.W.2d 155 (1947).  There the court stated, "Where one instrument refers to another for any purpose, the latter, for the purpose and extent of the reference, will be deemed a part of the former."  *Id.* at 157 (quotation omitted).

This Court thinks it enough to observe that this rule, by itself, may not be enough to incorporate the UFOCs in the operative terms of the franchise agreements.  And if this extrinsic evidence were incorporated, such a result contradicts many of the previously discussed rules for recitals, which appear in contracts yet ordinarily have no operative effect.  But this Court need not decide whether the UFOCs should be treated as operative terms.  As the following review shows, the UFOCs do not materially contradict the terms in the franchise agreements, and so the legal force of the UFOCs is entirely academic.

Much of the language in the UFOCs mirrors that in the franchise agreements.  Consistent with section 8 in the franchise agreements, the UFOCs state,

> We reserve the right to substitute different proprietary marks for
> identifying the System if we, in our sole discretion, determine that

---

[9]   At the motion hearing, the plaintiffs cited the parol evidence rule and suggested that, because the UFOCs are integrated into the franchise agreements, the UFOCs provide operative terms.  The parol evidence rule provides that, where parties enter into a fully integrated contract, prior agreements and negotiations by the parties cannot be used to contradict the unambiguous terms of the final writing.  *See Alpha Real Estate Co. v. Delta Dental Plan*, 664 N.W.2d 303, 312 (Minn. 2003).  The negative implication the plaintiffs derive from this rule is that, if the contract cites certain extrinsic evidence and thus is not integrated, the extrinsic evidence might properly be considered.

The parol evidence rule, however, only governs admissibility of prior agreements and negotiations, not other forms of extrinsic evidence.  *See Gutierrez v. Red River Distributing, Inc.*, 523 N.W.2d 907, 908 (Minn. 1994). And the UFOCs are not agreements or negotiations, but disclosures, which Ameriprise must provide to all its prospective franchisees.  If the franchise agreements are not fully integrated, this fact only affects the admissibility of prior negotiations, not other forms of extrinsic evidence.  This Court accordingly concludes that the parol evidence rule is not the appropriate framework for analysis here.

> substitution of different marks as Proprietary marks will be beneficial to the System, or if the Proprietary Marks can no longer be used.

* * *

> Although we do not have a license agreement with American Express Financial Company or American Express Financial Corporation authorizing us to use their marks or to allow you to use their marks, we are authorized by our parents to use their marks and to license them to use to use . . . .  If we are no longer authorized to use the Proprietary Marks, you will not be able to use the Proprietary Marks.

This language clearly discloses that Ameriprise has discretion to substitute a different brand, and so a franchisee may not necessarily always be able to use the American Express brand.  *Cf. infra* at 5.

The plaintiffs instead focus on language that substantially echoes that in the recitals.  For instance, the introductory portions of the UFOCs state,

> We have developed and own a distinctive system that offers, through financial advisors, financial planning, investment advice and consulting services . . . to individuals and/or business owners (the "System").  The distinguishing characteristics of the System include, without limitation, a well recognized brand; distinctive products & services; [etc.] . . . all of which may be changed, improved, and further developed by us from time to time.  The System is identified by trade names . . . including the mark "American Express" (the "Proprietary Marks").

*Cf. infra* at 6-7.  As this Court discussed earlier, this language does not expressly promise a well-established brand.  Nor does it override the more specific language in which Ameriprise reserves its right to substitute different marks at its discretion.  *See infra* at 13.  This language, therefore, does not disturb the prior analysis.

Perhaps the most significant statement, for the purposes of the current litigation, appears on the cover of the 2002 UFOC:  "As an American Express Financial Advisors Inc. franchisee,

you get the benefit of the American Express brand. . . ."  This statement is closest to expressing what the plaintiffs seek, a promise to provide a well-established brand.

At best, the statement highlights one of the primary features of the franchise at the time, use of the American Express brand.  But the statement does not promise a franchisee will always have use of the brand, or that Amerprise has an obligation to supply the brand.  Furthermore, as discussed at length beforehand, there is not language elsewhere in the UFOCs or the franchise agreements that support such an obligation.  This Court accordingly concludes that this statement is immaterial here.

### 6.      Waiver

Having exhausted the plaintiffs' arguments about whether Ameriprise has an obligation to supply a well-established brand, the defendants raise one defense that merits further comment.  Ameriprise and American Express argue, because the plaintiffs allowed the franchise agreements to renew after notice of the name change, the plaintiffs waived their right to assert a breach of contract based on that name change.

This argument is founded on the fact that the franchise agreements provide for automatic renewal.  The initial term of the agreements is three years, and if the parties do not take further action, the agreements automatically renew for another three-year term.  Although the plaintiffs allegedly had notice Ameriprise would not be using the American Express brand in early 2005, they allowed their agreements to renew in December 2005 and March 2006.

In the context of contracts law, Minnesota law offers a few different theories of waiver.  A party might waive the right to rescind, *In re Digital Resource, LLC*, 246 B.R. 357, 370 (B.A.P. 8th Cir. 2000); the right to demand performance of a condition, *Wolff v. McCrossan*, 210 N.W.2d 41, 43 (Minn. 1973); or the right to bring action for breach, *In re Landmark Holding Co.*, 286

B.R. 377, 383 (Bankr. D.Minn. 2002).  As the latter two theories involve waiver of some element of the other party's performance, this Court thinks that cases on waiver of conditions are equally persuasive in the context of waiver of breach.

Waiver occurs where a party voluntarily and intentionally relinquishes a known right. The intent to waive need not be shown through an express declaration or agreement.  Such intent may be inferred, instead, where a party knows of its rights yet continues to recognize the contract as binding.[10]  *See Dayton Devel. Co. v. Gilman Financial Servs., Inc.*, 419 F.3d 852, 858 (8th Cir. 2005); *Fischer v. Pinske*, 243 N.W.2d 733, 735 (Minn. 1976) (per curiam); *Wolff*, 210 N.W.2d at 43; *Creative Communications Consultants, Inc. v. Gaylord*, 403 N.W.2d 654, 657 (Minn. App. 1987).

The longer that a party accepts the benefits of a contract without objecting to the other's performance, the more likely that waiver occurs.  For this reason, the existence of a waiver is ordinarily deemed a question of fact, and implying waiver as a matter of law is disfavored.  *See Local 1142 v. United Elec., Radio & Machinists Workers*, 76 N.W.2d 481, 485 (Minn. 1956); *Farnum v. Peterson-Biddick Co.*, 234 N.W. 646, 647-48 (Minn. 1931).

Nothing in the record suggests an express waiver by the plaintiffs.  The threshold issue, therefore, is how waiver might be implied.  The defendants focus on the renewal of the franchise

---

[10]    The plaintiffs suggest that, if Ameriprise intends to establish waiver, it must show that it detrimentally relied on a representation by the plaintiffs.  They derive this proposition from a decision of the Minnesota Court of Appeals, *Hedged Investment Partners, L.P. v. Norwest Bank Minnesota, N.A.*  578 N.W.2d 765, 771-72 (Minn. App. 1998).  But this proposition is doubtful and has since been criticized for conflating waiver with equitable estoppel.  *Slidell, Inc. v. Millenium Inorganic Chems., Inc.*, 460 F.3d 1047, 1056 (8th Cir. 2006); *cf. Engstrom v. Farmers & Bankers Life Ins. Co.*, 41 N.W.2d 422, 424 (Minn. 1950) (implying that waiver, unlike equitable estoppel, does not require detrimental reliance by the party invoking waiver). Consistent with other Minnesota case law, this Court concludes that detrimental reliance is not an element of waiver here.

agreements. But as the preceding authorities indicate, the appropriate question is whether the plaintiffs continued to accept benefits under those agreements.

The standard of review requires the record to be taken with all reasonable inferences in the plaintiffs' favor. The franchise agreements provide for certain benefits for the plaintiffs, such as commissions, but there is no indication the plaintiffs actually received these benefits. And if the plaintiffs did receive these benefits, the record does not say how long the plaintiffs enjoyed them without challenging the name change. To the extent these questions remain unanswered, they must be resolved against waiver.

At this stage of proceedings, therefore, it is not possible to decide whether the plaintiffs waived their right to bring action on the breach. The defendants cannot obtain dismissal on this basis.

### 7.   Resolution of Claims

This Court has determined that, pursuant to the franchise agreements, Ameriprise has no obligation to provide a well-established brand. But this Court has yet to examine how this ruling affects the claims in the complaint.

### a.   Count I:  Breach of Contract

As noted at the outset, the first count of the plaintiffs' amended complaint is for breach of contract, for failure to supply a well-established brand. The claim is appropriately dismissed in its entirety.

### b.   Count III:  Breach of the Implied Covenant

In the third count of their amended complaint, the plaintiffs raise a claim for breach of the implied covenant of good faith and fair dealing. They contend that, because it did not supply a

well-established brand, Ameriprise improperly interfered with their performance of the franchise agreement.

Ameriprise interposes several arguments against this claim.  One is that, because it has no obligation to provide a well-established brand, its failure to do so cannot be deemed a breach of the implied covenant.  Consistent with this argument, Ameriprise says that its branding decisions did not interfere with the plaintiffs' performance of the franchise agreements, and the amended complaint lacks allegations of any such interference.

The controlling rule here is that the implied covenant does not impose any independent duties on the parties to a contract.  The implied covenant, instead, is an implicit agreement to act in good faith when performing the contract.  *See In re Hennepin County 1986 Recycling Bond Litigation*, 540 N.W.2d 494, 503 (D.Minn. 1995) (holding the implied covenant does not extend "to actions beyond the scope of the underlying contract"); *accord*, *Christensen v. Metropolitan Life Ins. Co.*, — F.Supp.2d —, 2008 WL 512705 at *5 n. 5 (D.Minn. 2008).  Put more simply, the implied covenant does not tell the parties *what* to do; it tells them *how* to do it.

If a contract does not impose a certain obligation on a party, therefore, that party's failure to perform that obligation cannot be the basis for a violation of the implied covenant.  *American Warehousing & Distributing, Inc. v. Michael Ede Mgmt., Inc.*, 414 N.W.2d 554, 557-58 (Minn. App. 1987); *cf. Midwest Sports Mktg., Inc. v. Hillerich & Bradsby of Canada, Ltd.*, 552 N.W.2d 254, 268 (Minn. App. 1996) (concluding that, where party based breach of contract and breach of implied covenant on identical allegations, failure to show breach was also fatal to the implied covenant claim).  Ameriprise has no obligation to provide a well-established brand; therefore, its purported failure to do so cannot be the basis for breach of the implied covenant.

One other issue requires discussion here.  Some of the plaintiffs' arguments potentially allude to a more novel theory of the implied covenant.  Under this theory, where an express term of contract grants a party discretion to do something, the implied covenant requires that party to exercise the discretion in good faith.  Although this theory of the implied covenant has yet to be expressly recognized in Minnesota law, it has found favor in some decisions from this District. *Compare Sterling Capital Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 125 (Minn. App. 1998), *with BP Prods. North America, Inc. v. Twin Cities Stores, Inc.*, 534 F.Supp.2d 959, 966 (D.Minn. 2007); *White Stone Partners, LP v. Piper Jaffray Cos.*, 978 F.Supp. 878, 882 (D.Minn. 1997).

This Court has determined that, under section 8 of the franchise agreements, Amerirprise has discretion to select a brand.  Because the plaintiffs instead focus on Ameriprise's purported obligation to supply a well-established brand, they do not argue that Ameriprise has discretion to select any brand, much less that Ameriprise exercised this discretion in bad faith.  And assuming the plaintiffs did intend to advance this theory of the implied covenant, they do not substantiate it in their amended complaint.

Regardless of the theory, the plaintiffs do not adequately plead a claim for breach of the implied covenant of good faith and fair dealing.  This claim is properly dismissed as well.

### c.    Count V:  Tortious Interference with Contract

The plaintiffs' fifth count is a claim against American Express for tortious interference with contract.  When American Express deprived Ameriprise of the American Express brand, the plaintiffs argue, American Express wrongfully interfered with the franchise agreements.

American Express contends that, because the plaintiffs have not shown a breach of the franchise agreements, they fail to establish a claim for tortious interference with the agreements.

American Express further argues that, even if there was a breach, it did not procure the breach; or if it did procure the breach, the breach was substantially justified.

To bring a claim for tortious interference with contract, the plaintiff must allege that the defendant intentionally procured a breach of contract, without justification, and caused damages. The absence of a breach, therefore, is fatal to a claim for tortious interference with contract. *See Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994).

The plaintiffs' claim here is also based on the contention that Ameriprise was obligated to provide a well-established brand under the franchise agreements. Because Ameriprise has no such obligation, there is no breach and likewise no claim for tortious interference with contract. The claim for tortious interference with contract, therefore, should also be dismissed. For this reason, this Court declines to reach the other arguments by American Express against this claim.

### B.      Enforceability of Covenant Not to Compete

In the second count of their amended complaint, the plaintiffs assert a second claim for breach of contract against Ameriprise. Regarding this count, the plaintiffs allege the franchise agreements include a covenant not to compete that is unenforceable for failure of consideration. For reasons that will soon be evident, this claim also implicates the plaintiffs' seventh count, for declaratory judgment.

### 1.      Remedy

At the threshold, Ameriprise correctly observes that the plaintiffs are asserting a claim for breach of contract, yet they do not describe the nature of the breach. In the context of a claim for breach of contract, a breach occurs where a party renounces its liability, or where it impedes or fails to perform its obligations under the contract. *Assoc. Cinemas v. World Amusement Co.*, 276 N.W. 7, 10 (Minn. 1937). The plaintiffs do not allege a breach that satisfies this definition.

What the plaintiffs are seeking, instead, is a declaration that the covenant not to compete is void.  The plaintiffs' second count is in effect a claim for declaratory judgment.  And in their papers, the parties discuss the noncompete in the context of declaratory judgment.  Moreover, the plaintiffs have pleaded declaratory judgment in the seventh count of their amended complaint, but they do not substantively describe the basis for declaratory judgment there.

Consistent with the parties' arguments, and taking the second and seventh counts of the amended complaint together, this Court will treat the issues regarding the noncompete as a claim for declaratory judgment.

### 2.      Existence of Controversy

The next question is whether the plaintiffs allege sufficient controversy for a declaratory judgment claim to go forward.  As the plaintiffs do not allege that Ameriprise intends to enforce the noncompete, Ameriprise contends, there is no live controversy within the jurisdiction of the court.  The plaintiffs respond that, if they cannot use the American Express marks, they intend to terminate the franchise agreements and pursue their own financial services businesses.  For this reason, the plaintiffs assert that there is a controversy that merits decision at this time.

### a.      Constitutional Concerns

The plaintiffs bring their declaratory judgment claim under Minnesota law, citing Minn. Stat. § 555.02.  This decision implicates some problems with subject matter jurisdiction, which this Court thinks it prudent to address on its own initiative at the outset.

Article III of the U.S. Constitution states that a federal court may only hear "cases" and "controversies."  Consistent with this requirement, if a claim for declaratory judgment proceeds under federal law, the plaintiff must establish that the claim involves a "substantial controversy."  This standard requires a definite and concrete dispute between the parties.  In the absence of such

a dispute, the court has no constitutional authority to render a decision, and thus it lacks subject matter jurisdiction over a declaratory judgment claim. *MedImmune, Inc. v. Genentech, Inc.*, 127 S.Ct. 764, 771-72 (2007); *Gopher Oil Co. v. Bunker*, 84 F.3d 1047, 1051 (8th Cir. 1996).

When a claim for declaratory judgment proceeds under the Minnesota law, the plaintiffs must demonstrate a "justiciable controversy." *Onvoy, Inc. v. Allete, Inc.*, 736 N.W.2d 611, 617-18 (Minn. 2007). And without a justiciable controversy, a court lacks jurisdiction to consider the claim. *State ex rel. Smith v. Haveland*, 25 N.W.2d 474, 476 (Minn. 1946).

What is interesting, in these circumstances, is that Minnesota case law does not explain *why* a court lacks jurisdiction: whether it is based on the state declaratory judgment statute or—analogous to the federal claim—the jurisdictional question derives from the state constitution. In either scenario, however, it appears state law would control the subject matter jurisdiction of this federal Court. Such a result may violate principles of federalism and the Supremacy Clause.

At this time, this Court will not further examine whether the plaintiffs may properly bring a state declaratory judgment claim in federal court. The parties have not meaningfully addressed this issue. As a matter of fairness and efficiency, this Court thinks it better to turn to the question of the existence of a controversy, an issue the parties have briefed at length and that also involves subject matter jurisdiction. Because this Court ultimately determines there is no controversy, it is not necessary to further examine other deficiencies of subject matter jurisdiction.

### b.      Standard

As briefly noted beforehand, when a declaratory judgment claim proceeds under federal law, the plaintiff must establish a "substantial controversy." Under the standard, there must be a concrete dispute between parties with adverse interests, and the dispute must be capable of relief by final judgment. The dispute cannot be hypothetical, nor should it seek an advisory opinion.

To determine whether a substantial controversy exists, the inquiry is factually intensive, based on a review of all the circumstances.  *See MedImmune, Inc.*, 127 S.Ct. at 771 (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937) and *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

Minnesota law requires a "justiciable controversy."  Contemporary cases set out a three-part standard for determining whether there is such a controversy.  There must be a claim that (1) involves a definite and concrete assertion of rights emanating from a legal source; (2) involves genuine conflict between parties with tangible adverse interests; and (3) is capable of specific resolution by judgment, rather than decided in an advisory opinion upon hypothetical facts.[11] *Onvoy, Inc.*, 736 N.W.2d at 617-18.

The state standard is substantially similar to the federal one, which is not surprising, as both originate from the same precedents of the U.S. Supreme Court.  *See Holiday Acres No. 3 v. Midwest Federal Sav. & Loan Ass'n*, 271 N.W.2d 445, 448 (Minn. 1978) (citing *Maryland Cas. Co.*); *Seiz v. Citizens Pure Ice Co.*, 290 N.W. 802, 805 (Minn. 1940) (citing *Aetna Life Ins. Co.*). This Court concludes that the differences between the two standards are immaterial.  Regardless of whether the plaintiffs should have brought their claim under state or federal law, cases under federal law are equally persuasive here.

---

[11]    The plaintiffs contend that, so long as the "ripening seeds" of a dispute are present, there is a controversy.  Although some recent case law refers to this phrase, it is but an older, more metaphorical expression of the standard for justiciable controversy.  *See Minneapolis Fed'n of Men Teachers, Local 238 v. Bd. of Educ.*, 56 N.W.2d 203, 205 (Minn. 1952) ("complainant is possessed of a judicially protectible right or status which is placed in controversy by the ripe or ripening seeds of an actual controversy with an adversary party"); *Rice Lake Contracting Corp. v. Rust Environment & Infrastructure, Inc.*, 549 N.W.2d 96, 99 (Minn. App. 1996).  To the extent that the plaintiffs urge a "ripening seeds" standard, that standard is not materially different and it does not meaningfully affect the analysis here.

### c.        Circumstances Involving Noncompetes

The existence of a controversy is a factually intensive issue.  As Minnesota case law has not examined controversy involving a noncompete, those authorities supply little guidance.  But federal authorities provide a useful framework for the analysis here.

Where an employee executes a noncompete, the existence of the noncompete by itself is not enough to establish a controversy.  Nor is it enough for the employee to express a desire to compete in the future.  There must be, at minimum, some allegations that the employee engaged in activity that violates the noncompete, or that the employer intends to enforce the noncompete. *Lyman v. St. Jude Medical S.C., Inc.*, 423 F.Supp.2d 902, 905 (E.D.Wis. 2006); *Cohen v. Orthalliance New Image, Inc.*, 252 F.Supp.2d 761 (N.D.Ind. 2003); *Bruhn v. STP Corp.*, 312 F.Supp. 903, 906-07 (D.Colo. 1970).  *But cf. Hodach v. Caremark RX, Inc.*, 374 F.Supp.2d 1222, 1225 (N.D.Ga. 2005) (in dictum, observing that under Georgia law, an employee may obtain declaratory judgment at any time regarding the scope of a noncompete).

According to the allegations in the amended complaint, Klosek terminated her franchise in late 2007; Davenport remains a franchisee.  Only Klosek, therefore, is in a position to violate the noncompete.  And the amended complaint does not say whether Klosek is engaged in activity that violates the noncompete, or whether Ameriprise is taking action to enforce the noncompete against Klosek.

In their arguments regarding the existence of a controversy, the plaintiffs largely rely on a chain of hypothetical events.  If they cannot use the American Express marks, they will terminate the franchise agreements.  And if they terminate the agreements, they will then pursue competing financial services businesses.  And if they pursue such businesses, Ameriprise will bring action to enforce the noncompete.

There is little reason to dispute that the plaintiffs and Ameriprise have adverse interests. But assuming that the plaintiffs ultimately become independent competitors against Ameriprise, the record does not explain the nature of that competition. Because such competition is founded on a hypothetical scenario, rather than particular facts, the parties' dispute is not meaningfully susceptible to a final judgment. Rather, the plaintiffs seek an advisory opinion about the scope and enforceability of the noncompete.

Even with reasonable inferences in their favor, the plaintiffs only express a hypothetical desire to compete in the future. Such allegations do not establish a controversy with regard to a noncompete. *See Lyman*, 423 F.Supp.2d at 905. For this reason, the plaintiffs cannot advance a claim for declaratory judgment. So to the extent the plaintiffs challenge the enforceability of the noncompete, in the second and seventh counts of their amended complaint, this claim is properly dismissed without prejudice.

### C.      Violations of the Minnesota Franchise Act

The remaining substantive issues arise under the fourth count of the plaintiffs' complaint, which asserts a claim against Ameriprise for violations of the Minnesota Franchise Act (MFA).

#### 1.      Standing to Sue

At the outset, Ameriprise argues that the plaintiffs lack standing to sue under the MFA. It cites Minn. Stat. § 80C.21. This statute is titled "waivers void," and it provides,

> Any condition, stipulation or provision, including any choice of law provision, purporting to bind any person who, at the time of acquiring a franchise is a resident of this state . . . or purporting to bind a person acquiring a franchise to be operated in this state to waive compliance or which has the effect of waiving compliance with any provision of [the MFA] or any rule or order thereunder is void.

This statute supplies a rule for the interpretation of certain franchise agreements, those where the franchisee either is a resident of Minnesota or operates a franchise there.  But the statute does not place any express limits on who may sue under the MFA.

In their amended complaint, the plaintiffs advance two potential theories for action under the MFA.  One is that Ameriprise committed certain unfair practices in violation of Minn. Stat. § 80C.14.  This theory does not depend on whether the plaintiffs' franchise agreements fall under the ambit of Minn. Stat. § 80C.21.  Because Minn. Stat. § 80C.21 does not inhibit the plaintiffs' standing to sue under Minn. Stat. § 80C.14, Ameriprise's argument is unavailing here.[12]

The plaintiffs' other theory is that the franchise agreements include a waiver that violates Minn. Stat. § 80C.21.  Assuming that this statute supplies a separate basis for a claim under the MFA, the plaintiffs do not meet the statutory requirements for the non-waiver rule.  The record shows that the plaintiffs reside in California and South Carolina, and they do business in those states.  This means that the plaintiffs cannot invoke Minn. Stat. § 80C.21, but consistent with the preceding analysis, it does not prejudice their ability to assert other remedies under the MFA.

To support its position that the plaintiffs lack standing, Ameriprise cites a decision from this District, *Healy v. Carlson Travel Network Associates, Inc.*  227 F.Supp.2d 1080 (D.Minn. 2002).  Quoting Minn. Stat. § 80C.19, subd. 1, the court ruled the MFA "applies to a franchise relationship 'when a sale or offer to sell is made in this state; when an offer to purchase is made

---

[12]     Ameriprise briefly argues that, because Klosek is no longer a franchisee, she cannot bring a claim under the MFA.  Klosek responds that the MFA is a remedial statute that provides relief for wronged franchisees, and so former franchisees cannot be denied claims under the MFA. Although neither side offers meaningful analysis on this question, the MFA does not require a disgruntled franchisee to maintain the franchise, and case law supplies several examples where former franchisees have brought claims under the MFA.  *See, e.g., Randall v. Lady of America Franchise Corp.*, 532 F.Supp.2d 1071, 1075-80 (D.Minn. 2007); *Current Tech. Concepts, Inc. v. Irie Enters., Inc.*, 530 N.W.2d 539, 541-42 (Minn. 1995).  This Court concludes that Klosek's status as a former franchisee is immaterial to her ability to assert a claim under the MFA.

and accepted in this state; or when the franchise is to be located in this state.'"  *See id.* at 1087.

Because the franchise sale occurred in Florida, the court reasoned, the franchisee had no claim

under the MFA.  *Id.* at 1088.

The *Healy* decision does not closely examine the language in the MFA.  It omits a critical

part of Minn. Stat. § 80C.19, subd. 1, which provides in full,

> The provisions of [the MFA] concerning sales and offers to sell
> shall apply when a sale or offer to sell is made in this state; when
> an offer to purchase is made and accepted in this state; or when the
> franchise is to be located in this state.

As the statute indicates, the geographic limits do not apply to the *entire* MFA, but only to "[t]he

provisions . . . concerning sales and offers to sell[.]"  And though Ameriprise urges otherwise, it

appears that *Healy* chiefly involved misrepresentations in the sale of a franchise, and not other

complaints under the MFA.  *See id.* at 1083-84.  Because the current litigation does not involve a

sale or offer to sell, it is distinguishable from *Healy*.

### 2.      Unfair Practices

Ameriprise also challenges the plaintiffs' MFA claim on the pleadings, contending that

the plaintiffs do not meaningfully explain the basis for this claim in the amended complaint.  The

plaintiffs respond by citing Minn. Stat. § 80C.14, which forbids unfair practices by franchisors,

and suggesting various ways that Ameriprise engaged in unfair practices.  Ameriprise counters

that the plaintiffs have not alleged those unfair practices in the amended complaint.

### a.      Regulatory Violations

The plaintiffs partly base their assertion of unfair practices on Minn. Stat. § 80C.14, subd.

1, which provides in relevant part,

> No person, whether by means of a term or condition of a franchise
> or otherwise, shall engage in any unfair or inequitable practice in
> contravention of such rules as the [state commissioner of

> commerce] may adopt defining as to the words "unfair and inequitable."

This subdivision does not, therefore, supply any substantive standard for determining whether a franchisor has engaged in unfair practices.   The plaintiffs accordingly cite two regulations that are promulgated pursuant to the subdivision.  One is Minn. R. 3860.4400, subp. G, which states,

> It shall be unfair and inequitable for any person to . . . impose on a franchisee by contract or rule, whether written or oral, any standard of conduct that is unreasonable;

the other is subp. I of the same rule, which makes it unfair and inequitable to

> enforce any unreasonable covenant not to compete after the franchise ceases to exist.

To establish violations of these rules, the plaintiffs turn to two provisions in the franchise agreements.  The first is the noncompete, which the plaintiffs claim is unreasonable and unduly restrictive.

The other provision controls assignments of the franchise.  The plaintiffs correctly note that, under the franchise agreements, Ameriprise has unrestrained discretion to assign its interests as franchisor.  The plaintiffs, by comparison, must receive consent from Ameriprise before they assign their interests as franchisees.  Because of this disparity, the plaintiffs argue, the franchise agreements impose inequitable standards of conduct.

This Court agrees with Ameriprise that, in the amended complaint, the plaintiffs do not offer any allegations to support either of these theories.  For this reason, they do not state a claim under Minn. Stat. § 80C.14, subd. 1.  But a few additional comments are appropriate.

As this Court previously observed in discussion of the declaratory judgment claim, the amended complaint suggests only a hypothetical dispute about the noncompete.  The plaintiffs do not explain how they may compete against Ameriprise, what efforts Ameriprise may take to

enforce the noncompete, or how the noncompete is unreasonable.  Just as these defects indicated the absence of a controversy, they likewise show a failure to allege how the noncompete violates the MFA.

Regarding the assignability provision, the underlying question is whether the provision imposes a "standard of conduct that is unreasonable[.]"  The parties do not offer much argument on this question, which is understandable, given the dearth of authority on the meaning of Minn. R. 3860.4400, subp. G.

With this caveat, this Court thinks the phrase "standard of conduct" is likely to refer the conduct of the franchisee when operating the franchise, rather than any rights that the franchisee has under the franchise agreement.  *Cf. McCabe v. Air-serv Group, LLC*, No. 07-4553, 2007 WL 4591932 at *5 (D.Minn. Dec. 28, 2007).

And regarding what is "unreasonable," this Court notes that a franchise agreement often favors the franchisor, as that party ordinarily has greater bargaining power.  A disparity between the rights of the parties, therefore, does not seem to be enough to render a franchise agreement unreasonable.  This court doubts that any purported disparity in assignability provisions, standing alone, is enough to establish a violation of the rule.

### b.      De Facto Termination

The plaintiffs also cite Minn. Stat. § 80C.14, subd. 3(a).  That subdivision provides that it is an unfair practice for a franchisor to terminate a franchise without giving proper notice to the franchisee.  As Ameriprise did not formally terminate the plaintiffs' franchises, the plaintiffs rely on a theory of "de facto termination," claiming termination occurred when American Express executed the spin-off of Ameriprise.

The parties do not dispute that de facto termination has yet to be recognized under the MFA. *See Healy v. Carlson Travel Network Assocs., Inc.*, 227 F.Supp.2d 1080, 1090 (D.Minn. 2002). This Court otherwise agrees with Ameriprise's contention that the plaintiffs have not offered allegations addressing de facto termination in their amended complaint. The plaintiffs thus do not state a claim under the MFA on this theory. Being mindful of these deficiencies in the pleadings, however, some informed analysis is possible.

In the few jurisdictions that recognize constructive or de facto termination of a franchise agreement, some suggest that the franchisee must show that the franchisor actually intended or threatened to put the franchisee out of business. *See JPM, Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 272-73 (7th Cir. 1996) (considering circumstances where franchisor threatened to put the franchisee out of business); *American Business Interiors, Inc. v. Haworth, Inc.*, 798 F.2d 1135, 1141 (8th Cir. 1986) (concluding that termination occurred when franchisor refused to continue doing business with franchisee); *see also Conrad's Sentry, Inc. v. Supervalu, Inc.*, 357 F.Supp.2d 1086, 1099 (W.D.Wis. 2005) (finding no constructive termination where franchisor had difficulty distributing products to franchisees). At least one jurisdiction proposes a more lenient rule, that constructive termination occurs where the conduct of a franchisor causes a substantial decline in the value of the franchise. *See Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1182-83 (2d Cir. 1995).

Even if these theories of constructive termination were to find favor under the MFA, the plaintiffs do not substantiate them in their amended complaint. They do not allege, for instance, that Ameriprise intended to put them out of business. Nor do the plaintiffs allege a substantial decline in the value of their franchises. Due to these deficiencies, the plaintiffs cannot support their MFA claims under a theory of de facto or constructive termination.

To the extent the plaintiffs argue de facto termination in their papers, they contend that it occurred when the spin-off transaction was executed. But this theory is not consistent with any of the recognized theories of constructive termination. This novel argument does not alter the outcome here.

In conclusion, the plaintiffs have not adequately pleaded that Ameriprise engaged in any unfair practices under the MFA. They have not shown regulatory violations, under Minn. Stat. § 80C.14, subd. 1; or improper termination, under Minn. Stat. § 80C.14, subd. 3(a). Because no unfair practices are alleged, the plaintiffs fail to state any claims under the MFA, and the fourth count of their amended complaint is appropriately dismissed in its entirety.

**D.      Residuary Counts**

The preceding analysis indicates that the plaintiffs have no claims for breach of contract, declaratory judgment, or violations of the MFA. But there remain a few residuary issues that merit further comment.

The first issue involves some questions about corporate entity. The plaintiffs imply that the claims against Ameriprise also proceed against its parent, Ameriprise Financial. Ameriprise counters that, because it is not an alter ego of its parent, the plaintiffs' claims against Ameriprise cannot be imputed to its parent.

This Court notes that the amended complaint lacks allegations on whether Ameriprise is an alter ego, or whether the liabilities of Ameriprise may be imputed to its parent. But assuming that liability may be imputed, this Court has determined that the plaintiffs have failed to state a claim against Ameriprise. For this reason, any claims against its corporate parent likewise fail.

The other issue involves the sixth and seventh counts of the amended complaint. In those counts, the plaintiffs bring claims for injunctive relief and declaratory judgment. But the counts

do not allege a substantive basis for relief, instead referring back to the counts for breach of contract and violation of the MFA.[13]  Because the plaintiffs have not stated the underlying claims for breach of contract and violation of the MFA, the sixth and seventh counts are appropriately dismissed as well.  This conclusion fully disposes of all the remaining counts in the amended complaint, which should be dismissed in its entirety.

## III.   CONCLUSION

In the franchise agreements, the unambiguous terms state that Ameriprise may substitute new marks at its discretion.  Ameriprise has no obligation, therefore, to supply a well-established brand.  Because the plaintiffs' claims against Ameriprise for breach of contract and breach of the implied covenant are founded on this obligation, as well as the claim against American Express for tortious interference with contract, these claims are properly dismissed.

To the extent the plaintiffs challenge the noncompete in the franchise agreements, they essentially seek a declaratory judgment that the noncompete is void and unenforceable.  Because the plaintiffs do not allege that they will compete with Ameriprise, or that Ameriprise intends to enforce the noncompete, the parties' dispute regarding the noncompete is hypothetical.  For this reason, there is insufficient controversy to supply jurisdiction over a declaratory judgment claim, and this matter is appropriately dismissed.

Even if the plaintiffs have standing under the MFA, they have not alleged that Ameriprise engaged in unfair practices that violate the MFA, either under a theory of regulatory violations or a theory of de facto termination.  This claim is appropriately dismissed as well.

---

[13]    As this Court observed beforehand, the declaratory judgment claim arguably includes the plaintiffs' claims about the noncompete.  But the declaratory judgment claim is not necessarily limited to the noncompete, and the declaratory judgment claim may embrace the plaintiffs' other claims for breach of contract and violation of the MFA.

This Court concludes that the defendants' motions to dismiss should be granted.  Aside from the matter regarding the noncompete, which is properly dismissed without prejudice, all other claims in the plaintiffs' amended complaint are appropriately dismissed with prejudice.

## IV.   RECOMMENDATION

Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1.   The defendants' motions to dismiss (Doc. No. 11, 13, 20, 21) be **GRANTED.**

2.   To the extent the plaintiffs seek declaratory judgment regarding the covenants not to compete in their franchise agreements, the matter be **DISMISSED WITHOUT PREJUDICE.**

3.   All other claims in the plaintiffs' amended complaint be **DISMISSED WITH PREJUDICE.**

4.   This litigation be dismissed in its entirety and judgment entered.

Dated this 3rd day of June, 2008.

s/ *Jeanne J. Graham*
JEANNE J. GRAHAM
United States Magistrate Judge

## NOTICE

Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by **June 17, 2008**.  A party may respond to the objections within ten days after service thereof.  Any objections or responses filed under this rule shall not exceed 3,500 words.  The district court judge shall make a de novo determination of those portions to which objection is made.  Failure to comply with this procedure shall forfeit review in the United States Court of Appeals for the Eighth Circuit.  Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve objections made to this report and recommendation, the party making the objections shall timely order and cause to be filed within ten days a complete transcript of the hearing.